IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Chief Judge Edward W. Nottingham**

Civil Action No. 03–cv–2311-EWN-CBS

LINDA M. PIERCY,

    Plaintiff,

v.

TERRY MAKETA, as Sheriff of El Paso County Sheriff's Office,
EL PASO COUNTY SHERIFF'S OFFICE and
THE BOARD OF COUNTY COMMISSIONERS OF THE COUNTY OF EL PASO,

    Defendants.

**ORDER AND MEMORANDUM OF DECISION**

This is a Title VII discrimination case. Plaintiff Linda M. Piercy alleges that Defendants Terry Maketa, El Paso County Sheriff's Office ("EPSO") and the Board of County Commissioners of the County of El Paso (collectively "Defendants") violated Title VII by discriminating against her because of her gender. This matter is before the court on (1) "Defendants' Motion to Dismiss, or in the Alternative Motion for Summary Judgment on Remand," filed October 22, 2007, and (2) "Plaintiff's Motion for Summary Judgment," filed October 22, 2007. Jurisdiction is based on 28 U.S.C. § 1331.

**FACTS**

*1.*     *Factual Background*

Ms. Piercy worked at EPSO as a security technician from June 1996 through March 17, 1997. (Defs.' Mot. to Dismiss, or in the Alternative for Mot. for Summ. J. on Remand [hereinafter "Defs.' Br."], Statement of Undisputed Material Facts [hereinafter "SOF"] ¶ 1 [filed Oct. 22, 2007]; *admitted at* Pl.'s Resp. to Defs.' Mot. to Dismiss, or in the Alternative for Summ. J. on Remand [hereinafter "Pl's Resp."], Resp. to Statement of Undisputed Material Facts [hereinafter "RSOF"] ¶ 1 [filed Nov. 14, 2007].) Plaintiff entered the EPSO Law Enforcement Training Academy on March 17, 1997 and became a Deputy Sheriff III in July 1997. (*Id.*, SOF ¶ 2; *admitted at* Pl.'s Resp., RSOF ¶ 2.) EPSO employed Plaintiff as a deputy sheriff from July 1997 through February 19, 2003. (*Id.*, SOF ¶ 3; *admitted at* Pl.'s Resp., RSOF ¶ 3.) EPSO terminated Plaintiff after it conducted an internal affairs investigation. (*Id.*, SOF ¶ 4; *admitted in relevant part at* Pl.'s Resp., RSOF ¶ 4.)

During her employment with EPSO, Plaintiff worked as a deputy sheriff in the detentions bureau at the Criminal Justice Center ("CJC"). (*Id.*, SOF ¶ 5; *admitted at* Pl.'s Resp., RSOF ¶ 5.) Plaintiff had advanced to Deputy Sheriff I by the time of her termination. (*Id.*, SOF ¶ 6; *admitted at* Pl.'s Resp., RSOF ¶ 6.) CJC houses mixed-security male and female inmates and contains separate male and female wards. (*Id.*, SOF ¶ 9; *deemed admitted at* Pl.'s Resp., RSOF ¶ 9.) Plaintiff worked as a deputy sheriff in the "Alpha 3" section of CJC. (Pl.'s Mot. for Summ. J. [hereinafter "Pl.'s Br."], SOF ¶ 1 [filed Oct. 22, 2007]; *admitted at* Defs.' Resp. to Pl.'s Mot. for Summ. J. [hereinafter "Defs.' Resp."], Resp. to Statement of Undisputed Material Facts [hereinafter "RSOF"] ¶ 1 [filed Nov. 13, 2007].) In Alpha 3, inmates are housed in an open area and have direct access to the guards whose desks are located in the open cell area. (Defs.' Br.,

SOF ¶ 9; *admitted at* Pl.'s Resp., RSOF ¶ 9; *see also* Pl.'s Br., SOF ¶ 1; *admitted at* Defs.' Resp., RSOF ¶ 1.)

At the time Plaintiff was employed, EPSO ran another detention facility in Colorado Springs called the Metro Jail Facility ("Metro"). (Defs.' Br., SOF ¶ 8; *admitted at* Pl.'s Resp., RSOF ¶ 8.) Metro was a maximum security facility that housed only male inmates at that time. (*Id.*) Metro inmates were kept under indirect supervision with no access to deputies, unless let out of cells. (Defs.' Br., SOF ¶ 9; *admitted at* Pl.'s Resp., RSOF ¶ 9.) EPSO closed Metro in April 2005 and transferred the inmates to CJC. (*Id.*, SOF ¶ 10.) At the time, EPSO housed 755 inmates at CJC, 130 to150 of whom were female, and employed 400 deputy sheriffs, 58 of whom were female. (*Id.*, SOF ¶ 12; *modified by* Defs.' Resp., RSOF ¶ 1.)[1]

### a. *Deputy Sheriffs' Duties*

A detentions deputy sheriff at CJC is responsible for care, custody and control of inmates and staff. (Defs.' Br., SOF ¶ 9; *admitted at* Pl.'s Resp., RSOF ¶ 9.) Specifically, the deputy sheriff must perform the duties necessary to ensure the safety and welfare of inmates and staff, resolve and control inmate crises through prevention and intervention, provide guidance and direction for questions regarding acceptable inmate behavior, and maintain security and control of the inmates by constant supervision. (*Id.*) Plaintiff alleges it was difficult to work in Alpha 3 because of the population, mix of prisoners, and noise. (Pl.'s Br., SOF ¶ 3; *denied at* Defs.' Resp., RSOF ¶ 3.) In support, Plaintiff cites the testimony of Deputy Grenier and Commander

---

[1] Defendants first stated that the number of female inmates at CJC at the time of Plaintiff's employment with EPSO was 119 but then in response to Plaintiff's motion changed the number from 119 to "approximately between 130 and 150. (*Compare* Defs.' Br., SOF ¶ 12 with Defs.' Resp., RSOF ¶ 1.)

Grayson. (*Id.*, Ex. 13 at 29, 70 [Grenier Dep.]; Ex. 12 at 17, 18 [Grayson Dep.].) Defendants allege that other female deputies did not have this sentiment and the difficulty level was relative, depending on numerous factors. (Defs.' Resp., RSOF ¶ 3, Ex. A–24 at 8, 9 [Whitney Dep.], Ex. A–4 at 16–17 [Goodall Dep.], Ex. A–22 at 43–44 [Maketa Dep.].)

EPSO's policy has been to conduct pat-searches by a deputy of the same sex whenever possible. (Defs.' Br., SOF ¶ 19, Ex. A–6–1 [EPSO Policy and Procedure 702(IV)(N)(3)].) EPSO's strip-search policy requires a member of the same sex to perform the strip-search. (*Id.*, SOF ¶ 20, Ex. A–6–1 [EPSO Policy and Procedure 702(IV)(N)(4)(c)].) Defendants' policy was that female deputy sheriffs may work in Alpha 3 alone, but that male deputy sheriffs may work in Alpha 3 only if accompanied by another deputy sheriff. (Pl.'s Br., SOF ¶ 4; *admitted at* Defs.' Resp., RSOF ¶ 4.) There is now one female deputy per shift stationed in each of the female wards in CJC. (Defs.' Br., SOF ¶ 16, Ex. A–7 at 16–17 [Presley Dep.].) These shifts can be assigned to male deputies if there are no female deputies available. (*Id.*) EPSO allowed opposite gender deputies to guard and transport prisoners. (*See* Defs.' Br., SOF ¶ 22, Ex. A–7 at 51–52 [Presley Dep.]; Defs.' Reply at 11.)

### b. *Metro Job Opening*

On August 27, 2002, EPSO issued a memo indicating that Metro Floor Security Positions were available but that "only requests from male deputies will be accepted." (Defs.' Br., SOF ¶ 25; *admitted at* Pl.'s Resp., RSOF ¶ 25.) Plaintiff claims that "Defendants have discriminated against Plaintiff in the terms and conditions of her employment on the basis of her sex in violation of Title VII." (Compl. at ¶ 24.)

Plaintiff filed a complaint of discrimination based on sex against Defendants with the Colorado Civil Rights Division ("CCRD") and the Equal Employment Opportunity Commission ("EEOC") on November 18, 2002. (*Id.*, SOF ¶ 37; *admitted at* Pl.'s Resp., RSOF ¶ 37.) The EEOC sent the "Notice of Charge of Discrimination" to Defendants on December 2, 2002. (*Id.*, SOF ¶ 37; Ex. A–21 [Notice of Charge of Discrimination].)

## 2. *Procedural History*

As stated above, in November 2002, Plaintiff filed a charge of discrimination with the EEOC asserting discrimination based on gender. (Compl. with Jury Demand ¶ 3 [filed Nov. 19, 2003] [hereinafter "Compl."].) On March 12, 2003, Plaintiff amended her charge to include allegations of retaliation. (*Id.*) The EEOC issued Plaintiff notice of a right to sue on August 22, 2003, and October 1, 2003, respectively. (*Id.* ¶ 4.) Plaintiff filed a complaint in this court on November 19, 2003, asserting that Defendants (1) discriminated against her on the basis of her sex and (2) retaliated against her for filing an EEOC complaint. (Compl. ¶¶ 23–28.)

On August 13, 2004, Defendants filed a motion to dismiss, or in the alternative, for summary judgment. On the same day, Plaintiff filed a motion for partial summary judgment. On March 18, 2005, this court granted Defendants' motion for summary judgment, finding: (1) no causal connection between a complaint Ms. Piercy filed with the Colorado EEOC and her termination that would support the retaliation claim; and (2) no adverse employment action that would support the sex discrimination claim. (Order and Memorandum of Decision [filed Mar. 18, 2005] [hereinafter "Order"].) On March 27, 2007, the United States Court of Appeals for the Tenth Circuit affirmed this court's grant of summary judgment "on the retaliation claim, but reversed and remanded for further proceedings on one aspect of the discrimination claim —

[Ms.] Piercy's allegation that she was precluded from transferring to El Paso's male-only jail." *Piercy v. Maketa*, 480 F.3d 1192, 1195 (10th Cir. 2007).

On October 22, 2007, Defendants filed a "Motion to Dismiss (pursuant to Fed. R. Civ. P. 12[b][6]), or in the Alternative Motion for Summary Judgment on Remand." (*See* Defs.' Br.) In their motion, Defendants argue that Plaintiff cannot establish a claim for gender discrimination because she did not suffer any adverse employment action and even if she did, gender is a *bona fide* occupational qualification ("BFOQ") and an affirmative defense to the alleged discrimination. (*See id.*) On November 14, 2007 Plaintiff responded. (Pl.'s Resp.) On November 28, 2007 Defendants replied. (Defs.' Reply)

On October 22, 2007, Plaintiff also filed a "Motion for Summary Judgment" arguing that summary judgment is appropriate on her gender discrimination claim because: (1) the Tenth Circuit's decision resolved the issue whether EPSO's policy constituted an adverse employment action in her favor; and (2) Defendants cannot show a BFOQ that is reasonably necessary to the normal operation of its business. (*See* Pl.'s Br.) On November 13, 2007 Defendants responded. (Defs.' Resp.) Plaintiff replied on December 3, 2007. (Pl.'s Reply)

## ANALYSIS

### 1. *Standards of Review*

#### a. *Rule 12(b)(6) Motion to Dismiss*

Federal Rule of Civil Procedure 12(b)(6) provides that a defendant may move to dismiss a claim for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6) (2008). "The court's function on a Rule 12(b)(6) motion is not to weigh potential evidence that the parties might present at trial, but to assess whether the plaintiff's complaint alone is legally

sufficient to state a claim for which relief may be granted." *Dubbs v. Head Start, Inc.*, 336 F.3d 1194, 1201 (10th Cir. 2003) (citations and quotation marks omitted).

Thus, all well-pleaded factual allegations in a complaint are accepted as true and construed in the light most favorable to the plaintiff. *Alvarado v. KOB-TV, L.L.C.*, 493 F.3d 1210, 1215 (10th Cir. 2007). Prior to the Supreme Court's decision in *Bell Atlantic Corp. v. Twombly*, — U.S. —, 127 S. Ct. 1955, 1974 (2007), dismissal of a complaint was appropriate only when it appeared that the plaintiff could prove no set of facts in support of the claims that would entitle him to relief. *Coosewoon v. Meridian Oil Co.*, 25 F.3d 920, 924 (10th Cir. 1994). In *Bell Atlantic*, the Supreme Court articulated a new "plausibility" standard, under which a complaint must include "enough facts to state a claim to relief that is plausible on its face." 127 S. Ct. at 1974.

In this case, the complaint includes "enough facts to state a claim to relief that is plausible on its face," *id*, which is why the Tenth Circuit remanded the case for further proceedings on Ms. "Piercy's allegation that she was precluded from transferring to El Paso's male-only jail." *Piercy*, 480 F.3d at 1195. Therefore, Defendants' motion to dismiss is denied and the court will treat Defendants' motion as one for summary judgment only.

### b. *Rule 56(c) Motion for Summary Judgment*

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, the court may grant summary judgment where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the . . . moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c) (2003); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *Concrete Works, Inc.*

*v. City & County of Denver*, 36 F.3d 1513, 1517 (10th Cir. 1994). The moving party bears the initial burden of showing an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). "Once the moving party meets this burden, the burden shifts to the nonmoving party to demonstrate a genuine issue for trial on a material matter." *Concrete Works, Inc.*, 36 F.3d at 1518 (citing *Celotex Corp.*, 477 U.S. at 325). The nonmoving party may not rest solely on the allegations in the pleadings, but must instead designate "specific facts showing that there is a genuine issue for trial." *Celotex Corp.*, 477 U.S. at 324; *see* Fed. R. Civ. P. 56(e). "'Only disputes over facts that might affect the outcome of the suit under governing law will preclude the entry of summary judgment.'" *Sanchez v. Denver Pub. Schs.*, 164 F.3d 527, 531 (10th Cir. 1998) (quoting *Anderson*, 477 U.S. at 248). The court may consider only admissible evidence when ruling on a summary judgment motion. *See World of Sleep, Inc. v. La-Z-Boy Chair Co.*, 756 F.2d 1467, 1474 (10th Cir. 1985). The factual record must be viewed in the light most favorable to the nonmoving party. *Concrete Works, Inc.*, 36 F.3d at 1518 (citing *Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc.*, 912 F.2d 1238, 1241 [10th Cir. 1990]).

*2.     Evaluation*

  *a.     Is EPSO's Policy Restricting Female Deputies From Transferring to Metro Discriminatory with Respect to "Terms, Conditions, or Privileges of Employment"?*

On August 27, 2002, EPSO issued a memo indicating that Metro Floor Security Positions were available, but "only requests from male deputies will be accepted [at this time]." (Defs.' Br., SOF ¶ 25; *admitted at* Pl.'s Resp., RSOF ¶ 13.) "Title VII of the Civil Rights Act of 1964 makes it 'an unlawful employment practice for an employer . . . to discriminate against any

individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.'" *Tademy v. Union Pacific Corp.*, 520 F.3d 1149, 1155–1156 (10th Cir. 2008) (emphasis added) (quoting *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21, 114 S.Ct. 367 [1993] [quoting 42 U.S.C. § 2000e-2(a)(1))].).

In this case, it is undisputed that the bases for Plaintiff's claim is a policy of Defendants that is discriminatory on its face. (Defs.' Br., SOF ¶ 25; *admitted at* Pl.'s Resp., RSOF ¶ 25.) Under Title VII, "[w]here an employer's policy is discriminatory on its face," the court reviews only to see "(1) if affected person is a member of discriminated class for purposes of standing; (2) whether policy affects rights protected by the statute; and (3) whether any affirmative defenses exist to the discrimination." *Piercy,* 480 F.3d at 1204 (internal citations omitted). It is also undisputed that Ms. Piercy is a female and therefore a member of the protected class. Thus, the two remaining questions before the court are: (1) whether EPSO's policy not to allow females to transfer to Metro is an adverse employment action that affects Ms. Piercy's protected rights under Title VII; and (2) whether Defendants can prove an affirmative defense to the discriminatory policy.

> **i.** ***Was EPSO's Action Preventing Females From Transferring to Metro an Adverse Employment Action with Respect to "Terms, Conditions, or Privileges of Employment"?***

The parties disagree as to whether the Tenth Circuit has already resolved this matter. In its analysis of Plaintiff's discrimination claim, the Tenth Circuit stated:

> Section 703(a) of the Civil Rights Act of 1964, as amended, makes it illegal for an employer "to discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C.2000e-2(a)(1). "[E]mployment decisions that adversely affect an employee's status" are covered by the statute. *Int'l Union v. Johnson Controls,*

> *Inc.*, 499 U.S. 187, 197, 111 S.Ct. 1196, 113 L.Ed.2d 158 (1991). And as we noted earlier, this approach requires us to consider "the unique factors relevant to the situation at hand." *Sanchez*, 164 F.3d at 532.
>
> Even if we were to analogize this case to Sanchez and its language regarding lateral transfers as the district court did, we are not convinced the case before us constitutes a truly "lateral transfer" where the job duties were substantially the same such that no adverse employment action occurred. Piercy claims EPSO's policy preventing any female from transferring to Metro materially discriminated against her and the other women deputies, and that, as a consequence, they were ineligible for work in Metro. Piercy points to evidence in the record (1) that work in Metro would be less arduous and stressful than CJC due to the indirect nature of supervision, and (2) that the opportunity to work Metro shifts increased her chances of obtaining additional job and leave flexibility. We think the differences in duties between the two prisons are sufficiently substantial to preclude the district court's finding that a transfer to Metro from CJC would be purely lateral.
>
> Summary judgment was improperly granted on whether Piercy's inability to transfer to Metro Jail was an adverse employment action.

*Piercy,* 480 F.3d at 1204–05.

Ms. Piercy concludes from this language that the Tenth Circuit resolved this issue in her favor and argues that "[t]he law of the case doctrine and mandate rule prohibits reargument [sic] of the lateral transfer issue." (*See* Pl.'s Resp. at 6–7.) Defendants disagree and argue that "the Tenth Circuit specifically stated that summary judgment was precluded on the issue of whether a transfer to Metro would be purely a lateral transfer, and remanded for further proceedings relating to the Metro transfer issue." (Defs.' Reply at 37.) Nonetheless, in total disregard of the Tenth Circuit above reasoning, Defendants surprise the court by arguing, again, that the court should find that the transfers was purely lateral. (*See* Defs.' Br. 25–33.)

The Tenth Circuit decision ruled out the characterization of the transfer in question as purely lateral. It did not, however, determine whether preventing female deputies from

transferring to Metro constitutes an adverse discrimination action within the meaning of Title VII. Instead it remanded the issue to this court for determination.

"The Tenth Circuit liberally defines the phrase 'adverse employment action.'" *Sanchez*, 164 F.3d at 532 (internal citations omitted). Such actions are not simply limited to monetary losses in the form of wages or benefits. *Id*. (Internal citation omitted). Instead, the court should "take 'a case-by-case approach,' examining the unique factors relevant to the situation at hand." *Id*. (Internal citation omitted). Nevertheless, the court "will not consider 'a mere inconvenience or an alteration of job responsibilities' to be an adverse employment action." *Id*. (citing *Crady v. Liberty Nat'l Bank & Trust Co.*, 993 F.2d 132, 136 [7th Cir.1993]; *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, ----, 118 S.Ct. 2257, 2268 [1998] [conduct is adverse employment action if it "constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits"]; *Spring v. Sheboygan Area Sch. Dist.*, 865 F.2d 883, 886 [7th Cir.1989] [principal's change in assignment was not an adverse employment action despite her increased commute and belief that the public perceived the transfer "as a 'nudge towards retirement'"]).

Throughout the case, the parties have disputed whether working in CJC was less difficult and stressful than Metro. This seems to be the dispositive issue that could determine whether Defendants' action constituted an adverse employment action, *i.e.*, whether Defendants discriminated against female deputies with respect to the terms, conditions, or privileges of their employment.

Plaintiff claims that "Metro was an all male direct supervision facility that was less stressful, less noisy and safer to work than CJC since it was a direct supervision facility." Plaintiff states, among other things, that: (1) "CJC was a large, open ward with no separation of female prisoners based on seriousness of the crime, mental illness, high or low security needs, etc.;" (2) "[o]ver the years, the female prison population steadily increased and set a record at about 220 prisoners;" (3) "Alpha 3 was set up in such a manner that a female deputy would sit at a desk that was accessible by all female prisoners in the open gymnasium-like hall;" (4) "Alpha 3 was perceived to be a more difficult ward to work because of the population, mix of prisoners and noise;" and (5) CJC "generally held more maximum security inmates than Metro." (*See* Pl.'s Br., SOF ¶ 1, Ex. 14 at 20–25 [Kortrey Dep.], Ex. 11 at 13–14 [Goodel Dep.], Ex. 16 at 6–7 [Whitney Dep.]; *id.*, SOF ¶ 2, Ex. 14 at 13–19 [Kortrey Dep.]; *id.*, SOF ¶ 3, Ex. 13 at 29, 70 [Grenier Dep.], Ex. 12 at 17–18 [Grayson Dep.]; Pl.'s Resp., RSOF ¶¶ 9, 17, 18 [citing Defs.' Br., Ex. A–22 at 41 [Maketa Dep.], 22 [citing Defs.' Br., Ex. A–22 at 41 [Maketa Dep.].)

Defendants, on the other hand, argue that "the duties of the deputy sheriffs were the same whether they were at Metro or CJC regarding pat-searching, strip-searching and supervising inmates. (Defs.' Br. at 25, Ex. A–6 at ¶ 5 [Presley Aff. 08/16/08), Defendants deny that working at CJC, in comparison with Metro, was less difficult and stressful, alleging that: (1) "the only difference [between the two] was in the type of supervision at each facility, as Metro was indirect supervision while CJC was direct supervision;" (2) "where administrative segregation was necessary for certain inmates, *i.e.*, mentally ill, those inmates were confined to a cell, as opposed to being in the open area of the ward," with the exception of the "inmates whose mental status required special precautions;" (3) "Alpha 3 may have been subjectively perceived by

Plaintiff and some others as a more difficult ward, but it was not considered to be such by all deputies;" (4) "the pay, benefits, and other compensation for deputies were the same whether Plaintiff was assigned to Metro or CJC;" and (5) at the time of Plaintiff's employment with EPSO, "the average female inmate population was between approximately 130 and 150." (*See* Defs.' Resp., RSOF ¶¶ 1–2, Ex. A–12 to Dkt. 112 ¶¶ 6, 7, 11 [Presley Dep.]; *id.*, RSOF ¶ 3, Ex. A–24 to Dkt. 112 at 8–9 [Whitney Dep.], Ex. A–4 to Dkt. 112 at 16–17 [Goodall Dep.], Ex. A–22 to Dkt. 112 at 43–44 [Maketa Dep.]; Defs.' Br. at 25, Exs. A–12 at ¶ 12 [Presley Aff. 07/27/08], A–13 at ¶¶ 4, 6 [Goodal Aff. 04/12/08]; *id.* at 26, Ex. A–5 at ¶ 3–4 [Presley Aff 10/29/04.].)

Considering the arguments above, the dispute between the parties regarding the differences between the job duties at CJC and Metro involves an issue of material fact "that might affect the outcome of the suit under governing law." *Sanchez*, 164 F.3d at 531; *Piercy,* 480 F.3d at 1205 ("the differences in duties between the two prisons are sufficiently substantial to preclude the district court's finding that a transfer to Metro from CJC would be purely lateral."). Therefore, the court finds that it is for the jury to decide whether preventing Ms. Piercy from transferring to Metro constitutes an adverse employment action with respect to "terms, conditions, or privileges of employment." *Id*. Thus, both parties' motions for summary judgment on this issue are denied.

### ii. Was EPSO's Policy not to Allow Females to Transfer to Metro a *BFOQ Necessary to the Normal Operation of Metro?*

The court now turns to the question whether EPSO's policy is one of the rare instances that come within the BFOQ exception. As mentioned above, "under § 703(e)(1) of Title VII, an employer may discriminate on the basis of 'religion, sex, or national origin in those certain

instances where religion, sex, or national origin is a bona fide occupational qualification reasonably necessary to the normal operation of that particular business or enterprise.'" *Johnson Controls, Inc*., 499 U.S. at 200–201, 111 S.Ct. at 1204 (quoting 42 U.S.C. § 2000e-2[e][1]).

"The BFOQ defense is written narrowly, and this Court has read it narrowly." *Id*. (citing *Dothard v. Rawlinson*, 433 U.S. 321, 332-337, 97 S.Ct. 2720, 2728–2731 [1977]; *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 122–125, 105 S.Ct. 613, 622–624 [1985]). The "emphasis on the restrictive scope of the BFOQ defense is grounded on both the language and the legislative history of § 703." *Id*.

> The wording of the BFOQ defense contains several terms of restriction that indicate that the exception reaches only special situations. The statute thus limits the situations in which discrimination is permissible to "certain instances" where sex discrimination is "reasonably necessary" to the "normal operation" of the "particular" business. Each one of these terms-certain, normal, particular-prevents the use of general subjective standards and favors an objective, verifiable requirement. But the most telling term is "occupational"; this indicates that these objective, verifiable requirements must concern job-related skills and aptitudes.

*Id*.

Defendants have the burden of proving that its discriminatory qualification is a BFOQ. *See Price Waterhouse v. Hopkins*, 490 U.S. 228, 248, 109 S.Ct. 1775, 1789 (1989); *Dothard*, 433 U.S. at 333, 97 S.Ct. at 2728–29. Thus, the court will analyze whether the evidence is sufficient for Plaintiff to survive summary judgment in light of Defendants' burden of proof to establish a BFOQ.

### A. *Was Prohibiting Female Deputies From Transferring to Metro Based on a Concern That Female Deputies Could not Maintain the Security of the Prison?*

To establish that Defendants' policy was a BFOQ, Defendants need to prove that their concern was relevant to a female's ability or inability to perform and "the performance involved

instances where religion, sex, or national origin is a bona fide occupational qualification reasonably necessary to the normal operation of that particular business or enterprise.'" *Johnson Controls, Inc*., 499 U.S. at 200–201, 111 S.Ct. at 1204 (quoting 42 U.S.C. § 2000e-2[e][1]).

"The BFOQ defense is written narrowly, and this Court has read it narrowly." *Id*. (citing *Dothard v. Rawlinson*, 433 U.S. 321, 332-337, 97 S.Ct. 2720, 2728–2731 [1977]; *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 122–125, 105 S.Ct. 613, 622–624 [1985]). The "emphasis on the restrictive scope of the BFOQ defense is grounded on both the language and the legislative history of § 703." *Id*.

> The wording of the BFOQ defense contains several terms of restriction that indicate that the exception reaches only special situations. The statute thus limits the situations in which discrimination is permissible to "certain instances" where sex discrimination is "reasonably necessary" to the "normal operation" of the "particular" business. Each one of these terms-certain, normal, particular-prevents the use of general subjective standards and favors an objective, verifiable requirement. But the most telling term is "occupational"; this indicates that these objective, verifiable requirements must concern job-related skills and aptitudes.

*Id*.

Defendants have the burden of proving that its discriminatory qualification is a BFOQ. *See Price Waterhouse v. Hopkins*, 490 U.S. 228, 248, 109 S.Ct. 1775, 1789 (1989); *Dothard*, 433 U.S. at 333, 97 S.Ct. at 2728–29. Thus, the court will analyze whether the evidence is sufficient for Plaintiff to survive summary judgment in light of Defendants' burden of proof to establish a BFOQ.

### A. *Was Prohibiting Female Deputies From Transferring to Metro Based on a Concern That Female Deputies Could not Maintain the Security of the Prison?*

To establish that Defendants' policy was a BFOQ, Defendants need to prove that their concern was relevant to a female's ability or inability to perform and "the performance involved

instances where religion, sex, or national origin is a bona fide occupational qualification reasonably necessary to the normal operation of that particular business or enterprise.'" *Johnson Controls, Inc*., 499 U.S. at 200–201, 111 S.Ct. at 1204 (quoting 42 U.S.C. § 2000e-2[e][1]).

"The BFOQ defense is written narrowly, and this Court has read it narrowly." *Id*. (citing *Dothard v. Rawlinson*, 433 U.S. 321, 332-337, 97 S.Ct. 2720, 2728–2731 [1977]; *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 122–125, 105 S.Ct. 613, 622–624 [1985]). The "emphasis on the restrictive scope of the BFOQ defense is grounded on both the language and the legislative history of § 703." *Id*.

> The wording of the BFOQ defense contains several terms of restriction that indicate that the exception reaches only special situations. The statute thus limits the situations in which discrimination is permissible to "certain instances" where sex discrimination is "reasonably necessary" to the "normal operation" of the "particular" business. Each one of these terms-certain, normal, particular-prevents the use of general subjective standards and favors an objective, verifiable requirement. But the most telling term is "occupational"; this indicates that these objective, verifiable requirements must concern job-related skills and aptitudes.

*Id*.

Defendants have the burden of proving that its discriminatory qualification is a BFOQ. *See Price Waterhouse v. Hopkins*, 490 U.S. 228, 248, 109 S.Ct. 1775, 1789 (1989); *Dothard*, 433 U.S. at 333, 97 S.Ct. at 2728–29. Thus, the court will analyze whether the evidence is sufficient for Plaintiff to survive summary judgment in light of Defendants' burden of proof to establish a BFOQ.

### A. *Was Prohibiting Female Deputies From Transferring to Metro Based on a Concern That Female Deputies Could not Maintain the Security of the Prison?*

To establish that Defendants' policy was a BFOQ, Defendants need to prove that their concern was relevant to a female's ability or inability to perform and "the performance involved

the central purpose of the enterprise." *Johnson Controls,* 499 U.S. at 203, 111 S.Ct. at 1196 (internal citations and punctuation omitted). "The essence of a correctional counselor's job is to maintain prison security" — in this case, security of Metro. *Id.* (quoting *Dothard*, 433 U.S. at 335, 97 S.Ct. at 2729–2730.). Therefore, in order to prove that its policy is a BFOQ, Defendants need to show "factual basis for believing that all or substantially all women would be unable to perform safely and efficiently the duties of the job involved," *id.* at 1208 (citing *Weeks v. Southern Bell Tel. & Tel. Co.*, 408 F.2d 228, 235 [5th Cir. 1969]) or that "the very womanhood or very manhood of the employee undermines his capacity to perform a job satisfactorily." *Everson v. Michigan Dept. of Corrections*, 391 F.3d 737, 748–49 (6th Cir. 2004) (citing *Torres v. Wisc. Dep't of Health & Soc. Servs.*, 859 F.2d 1523, 1528 [7th Cir. 1988] [en banc]).

Not only have Defendants not made such a showing but they conceded, to the contrary, that female deputies are capable of performing the central purpose of EPSO's enterprise, *i.e.*, maintaining prison security. (*See* Defs.' Br., SOF ¶ 17 ["Female deputy sheriffs can be assigned to male wards . . . There are no male wards from which a female deputy is restricted from working . . ."]; ¶ 18 ["When a female deputy is assigned to a male ward, she is allowed to be the sole deputy assigned to that ward on that shift."]; ¶ 22 [CJC allows opposite gender deputies to guard opposite gender prisoners and allows opposite gender guards to transport opposite gender prisoners."]; ¶ 28 ["The deputy sheriffs assigned to Metro performed the same duties as those deputy sheriffs assigned to CJC, including pat-searching, strip-searching, transport of inmates, and guarding inmates.]; Defs.' Reply at 11 ["female deputies do guard male inmates at CJC, and did guard male inmates at Metro in the past."].)

Defendants argue that "[t]he decision not to allow female deputies to apply for Metro positions in August 2002 was based upon the operational requirement for female deputies to be staffed at CJC, which was the only facility, at that time, where female inmates were housed." (*See* Defs.' Br. at 11.) This, however, is irrelevant. The EPSO policy in question today is the one that prohibits female deputies from being *transferred* to Metro — an action that might have affected female employees' "terms, conditions, or privileges of employment"— not the *gender-based assignments* at CJC.[2]

Defendants must show that, standing alone, and regardless of the need for its gender-based assignments at CJC, gender is a BFOQ when it comes to EPSO's transfer policy regarding Metro. Instead, Defendants have devoted almost their entire argument to demonstrate that gender can be a BFOQ when it comes to its policy that allows gender-based assignments at CJC. (*See* Defs.' Br. *passim*.)

Defendants try to justify EPSO's "operational requirement" by linking it to the privacy and safety considerations that require sufficient female staff at CJC, by stating that "if EPSO has the requisite number of female deputies to perform all of the functions necessary for the proper functioning of CJC, then females would certainly be considered for deputy positions at Metro." (Defs.' Br. at 16 [citation and internal quotation omitted].) But they fail because they cannot

---

[2] A study of the cases addressing the issue whether gender can be a BFOQ for corrections officers in female correctional facilities show that if narrowly tailored "the goals of security, safety, privacy, and rehabilitation can justify gender-based *assignments* in female correctional facilities." *See Everson*, 391 F.3d at 749–750 (emphasis added) (citing *Reed v. County of Casey*, 184 F.3d 597, 600 [6th Cir. 1999]; *Robino v. Iranon,* 145 F.3d 1109, 1110–11 [9th Cir. 1998]; *Tharp v. Iowa Dep't of Corr.,* 68 F.3d 223, 226 [8th Cir. 1995]; *Torres,* 859 F.2d at 1532.) However, the question whether gender is a BFOQ when it comes to EPSO's policy regarding its gender-based assignments is a separate question not before the court today.

show how this complete ban on transferring female deputies is in any way related to maintaining prison security at Metro.

Not only do Defendants fail to carry their burden of proof, they concede that "the operational necessity was not in Metro, the operational necessity was at CJC, to have female deputies available to search and strip-search female inmates . . . And that at that time we did not feel that we had enough female deputies to meet and certainly did not exceed those operational requirements." (Defs.' Reply at 9–10 [citation and internal quotation omitted].) "Had there been the requisite number of female deputies to staff CJC, female deputies would most certainly have been considered for deputy for deputy positions at Metro." (*Id.* at 10 [citation and internal quotation omitted].) Therefore, as far as appears in the record, female deputies participate in maintaining prison security as efficiently as male deputies.

Based on the forgoing, Defendants fail to show that: (1) prohibiting female deputies from transferring to Metro was based on a concern that female deputies could not maintain the security of prison; (2) all or substantially all women would be unable to perform safely and efficiently the duties of the job involved; or (3) the very womanhood of the employee undermines her capacity to perform the job satisfactorily. Therefore, Defendants fail to show that gender is a BFOQ in this case.

Moreover, the BFOQ defense is not available if there was some less restrictive alternative available to the employer which could have avoided the sex classification. *See Harless v. Duck,* 619 F.2d 611, 617 (6th Cir. 1980). Considering the facts that (1) Defendants do not dispute female deputies' ability to maintain the security of Metro and (2) do not offer a reason for not remedying the shortage of female deputies at CJC, a plausible reading of Defendants' above

-17-

argument seems to be that their concern is related to the cost of hiring more female deputies for CJC and not, as required by law, related to female deputies' ability to perform the essence of their job at Metro. "The extra cost of employing members of one sex, however, does not provide an affirmative Title VII defense for a discriminatory refusal to hire members of that gender." *Johnson Controls,* 499 U.S. at 210, 111 S.Ct. at 1209 (citing *Los Angeles Dept. of Water and Power v. Manhart,* 435 U.S. 702, 716–718, 98 S.Ct. 1370, 1379–1380, and n.32.). EPSO's policy seems to have been that because it had not hired enough female deputies the ones who were actually employed at the time had to bear the cost (assuming that Plaintiff can prove that there was a cost, *i.e.*, the prevention from transfers was in fact an adverse employment action under Title VII).

In conclusion, Defendants' concern regarding the shortage of female deputies in CJC does not suffice to establish a BFOQ. It is one thing to create narrowly tailored gender-based assignments that would achieve a legitimate goal and only cause inconvenience for a small number of individuals. It is another thing altogether to preclude an entire protected class from being transferred and thereby affect their "terms, conditions, or privileges of employment" in violation of law — let alone if the preclusion is based on a concern not related to performance of the essence of the job. Title VII simply does not allow discrimination because of cost to the enterprise.

The court finds that Defendants: (1) fail to carry their burden and cannot establish a BFOQ when it comes to prohibiting female deputies from transferring to Metro; and (2) concede that female deputies are able to maintain prison security at Metro. Therefore, there is no issue of material fact regarding Defendants' BFOQ defense and Plaintiff's motion for summary judgment

on this issue is granted. Thus, if Plaintiff succeeds in showing that prohibiting a transfer to Metro is an adverse employment action in this case, BFOQ does not provide Defendants with an affirmative action to discrimination.

### 3. *Conclusion*

Based on the foregoing it is therefore ORDERED as follows:

1. Plaintiff's Motion for Summary Judgment (# 113) is GRANTED in part and DENIED in part.

2. Defendants' Motion to Dismiss or, in the alternative, for Summary Judgment (# 112) is Denied.

3. The final judgment entered at the conclusion of this case will reflect this order that the clerk enter judgment in favor of Plaintiff and against Defendants as to the issue of availability of a BFOQ as an affirmative defense to discrimination.

4. The only remaining question is whether EPSO's action preventing female deputies from transferring to Metro was an adverse employment action with respect to "terms, conditions, or privileges of employment," which shall be decided by the jury at trial.

The court will hold a Final Pretrial Conference commencing at 3:15 o'clock p.m. on July 25, 2008, in Courtroom A201 of the Alfred A. Arraj United States Courthouse, 901 19th Street, Denver, Colorado. In preparing for and participating in the conference, the parties and counsel will (1) follow the Instructions for Preparation and Submission of Final Pretrial Order, a copy of which can be downloaded from the court's web site, specifically http://www.cod.uscourts.gov/Documents/Judges/EWN/ewn_fin_pre_ord_ins.pdf and (2) utilize the specific template located at

http://www.cod.uscourts.gov/Documents/Judges/EWN/ewn_fin_pre_ord.wpd  These specific web addresses should be used to insure that the proper format is observed.

Dated this 30th day of June, 2008.

BY THE COURT:


s/ Edward W. Nottingham
EDWARD W. NOTTINGHAM
Chief United States District Judge